**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DUNCAN LAWSON and JANE DOE, *A Minor Child, PPA Duncan Lawson*,   Plaintiffs,<br><br>            v.<br><br>TIMOTHY HILDERBRAND, GARY HOFFKINS, RICHARD STOOK, JOSEPH RONDINI, FREDERICK QUEZADA, and TOWN OF GREENWICH,   Defendants. | No. 3:13-cv-00206 (JAM) |

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

When Scott Lawson was arrested by the Greenwich police one night for selling OxyContin pills, he told them that he had a few more pills in his bedroom at home. Scott was 21 years old. He lived at home with his father, his 16-year-old brother, and his 11-year-old sister. Four police officers promptly decided to go to Scott's house in search of the pills that he said were there. It was late at night. The police did not have a warrant. They resorted instead to a classic "knock and talk" routine: presenting themselves at the Lawson home to ask Scott's father to invite them in for a talk and then, once inside, asking Scott's father to consent to a search of Scott's bedroom for what contraband might be found.

The knock-and-talk strategy has long featured prominently and controversially in the playbook of law enforcement practices. *See generally* Craig M. Bradley, *"Knock and Talk" and the Fourth Amendment*, 84 Ind. L.J. 1099 (2009); Andrew Eppich, Note, *Wolf at the Door: Issues of Place and Race in the Use of the "Knock and Talk" Policing Technique*, 32 B.C. J. L. & Soc. Just. 119 (2012). On its face, a knock-and-talk is often a sound law enforcement tactic.

1

Many homeowners will readily consent to cooperate with the police, and the police may save valuable time that would be expended on applying for and obtaining a search warrant.

Still, knock-and-talk encounters may also be ripe for manipulation and abuse. To begin with, police may be less than forthcoming with homeowners about the reasons they want the owner to let them into the home. They may ask the homeowner to let them in to *talk*, when in reality they want to *search*; a knock-and-talk may be a guise for a knock-and-search. If the homeowner decides not to let the police search and asks them to leave, the police may exploit the fact that the homeowner has already granted them entry. They may insist now on occupying the home and detaining all its occupants for hours unless the homeowner relents or until a judge can be found to issue a search warrant.

This is a case about a knock-and-talk encounter that allegedly went quite wrong. According to plaintiffs, the police tricked their way into the Lawson family home on the pretense that they just wanted to talk to Scott's father about Scott's drug problems. Scott's father let them in but then declined to consent to a search of Scott's room for evidence. He asked the police to leave, but they refused. And instead they punished the innocent Lawson family with a battery of police-state-style tactics. They threatened to report Scott's father to the Department of Children and Families (DCF) and to have his children taken away. They threatened to seek a search warrant for the *entire* house if the father would not allow them to search only Scott's bedroom. Purportedly needing to "secure" the house pending their application to a judge for a search warrant, they forced Scott's father to wake up his sleeping children and then corralled the entire family into a single room of the house late into the night. When Scott's father insisted that the children be allowed to go back to bed, the police arrested him and took him away. The Greenwich police did all this with no indication that the father or children intended to destroy

evidence or that they posed any threat of harm to the police.

Plaintiffs are Scott's father and 11-year-old sister. They filed this federal lawsuit against the police officers involved and the Town of Greenwich, and defendants have all moved for summary judgment. I conclude that genuine issues of fact remain for trial on most of the counts alleged in plaintiffs' complaint: genuine issues of fact remain to suggest that the Greenwich police illegally searched the Lawson family home, that they illegally detained the Lawson family while seeking a search warrant, that they illegally arrested Scott's father when the police had no right to be in the home in the first place, and that they intentionally inflicted emotional distress on the Lawson family as a consequence of the father's insistence on the family's constitutional rights and his refusal to go along with an errant knock-and-talk scheme.

## BACKGROUND

In light of the standards governing defendants' motion for summary judgment, the following facts are set forth on the basis of the parties' submissions and as viewed in the light most favorable to plaintiffs. On November 18, 2010, a confidential informant advised the police in Greenwich, Connecticut that Scott Lawson was actively selling OxyContin tablets. Scott was 21 years old, and he lived in Greenwich with his father Duncan Lawson, his 16-year-old brother, and his 11-year-old sister.

The informant told the police that Scott had just received a shipment of pills and that he would be driving around in his blue VW Beetle to distribute them. The police set up surveillance outside Scott's home, and after they saw him leave in his VW Beetle, they stopped him and placed him under arrest for drug distribution. Scott promptly told the police that he was a drug addict, that he sold pills to support his addiction, that his mother had died in the last year, and

that he was not dealing with it very well. Doc. #64-11 at 3. He said he had "a few more illegal pills at home in his bedroom." *Ibid*; Doc. #64-4 at 3; Doc. #64-10 at 1.

It was then about 10:30 p.m., and four of the defendant police officers—Sergeant Timothy Hilderbrand, Detective Gary Hoffkins, Officer Richard Stook, and Officer Frederick Quezada—decided to go to Scott's home in search of the pills he had said were there. The police had not applied for a search warrant. Scott's father—Duncan Lawson—answered the door. The police told him that Scott had been arrested, that he had a drug addiction problem, and that—according to Duncan's sworn affidavit—"it would be better to discuss the sensitive matter of Scott's drug problem and arrest inside my home rather than outside with an audience." Doc. #64-6 (Duncan Aff.) at 2.

Once inside, the four officers asked for the first time for consent to search Scott's bedroom. Duncan declined to consent, after making a phone call for legal advice. The police told Duncan that if he would not provide consent for the warrantless search of Scott's bedroom, they would seek a warrant to search the entire residence. Duncan then told the officers to leave and that he would cooperate if they came back with a warrant.

But this was not good enough for the police, who were now evidently bent on occupying the home—perhaps long into the night—until Duncan might change his mind or until they could find a judge to issue a late-night search warrant. According to Duncan's sworn affidavit, Hilderbrand—who was the ranking officer on the scene and in charge of the other defendants— threatened to arrest Duncan if he would not permit a warrantless search of his home; the officers told Duncan that "[he] was making it hard on [him]self." *Id.* at 7. Thereafter, according to Duncan, "the defendants threatened to take my children away from me, and to report me to the

Department of Children and Families for this purpose because I would not agree to the warrantless search." *Ibid.*[1]

In the meantime, the police also decided that they must secure the premises. That meant waking sleeping children to collect them in the family living room until a search warrant could be obtained and executed. One or more of the officers escorted Duncan upstairs to wake the children. They were sleeping in bedrooms separate from Scott's bedroom. Duncan and his children were ordered to remain in the living room,[2] and two of the four officers—Hoffkins and Stook—left to apply for a search warrant. At some point, a fifth Greenwich police officer— Officer Joseph Rondini—arrived. He entered the residence without Duncan's consent.[3]

Evidently angry and frustrated by the police occupation of his home, Duncan instructed his children several times to return upstairs to their bedrooms to sleep. But the officers told the children to disregard their father, and they blocked them from going upstairs. Duncan also asked his son to retrieve his Blackberry smartphone from upstairs, so that Duncan could electronically record the officers' actions. But the officers physically prevented the son from doing so.

---

[1] Although defendants dispute any such threats, Duncan's account is set forth with particularity in a summary judgment affidavit. No depositions were taken during discovery in this case. The fact that Duncan's sworn account may purportedly be self-serving or that it may be contradicted by multiple affidavits of police officers is not grounds for me to discredit Duncan's account at the motion-for-summary-judgment stage of this litigation. *See, e.g., Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014) (*per curiam*); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). At any rate, a police report and DCF records indicate that Officer Rondini did make a report of suspected child abuse/neglect to DCF based on the events of that night. Doc. #77 at 23–25.

[2] There is a factual dispute regarding whether the family was told they could simply abandon their home in the middle of the night, rather than remain under police supervision in their living room. *Compare* Doc. #62-2 (Hilderbrand Aff.) at 3 ("Plaintiffs were told that they could leave the [r]esidence if they wished rather than stay in the living room."), Doc. #62-3 (Quezada Aff.) at 3 (same), Doc. #62-5 (Stook Aff.) at 3 (same), *and* Doc. #62-6 (Hoffkins Aff.) at 3 (same), *with* Doc. #64-6 (Duncan Aff.) at 4 ("At no time whatsoever did any defendant state that we were free to leave our home . . . . To the contrary, on several occasions the defendants repeated their order that we remain in the living room."). The police incident report states that the family was told to remain in the living room, and it does not state whether the family was told they could leave the home. Doc. #64-11 at 4. Defendants insist that family members were also permitted access as needed to the bathroom and kitchen. Doc. #75-1 (Hilderbrand Aff.) at 1.

[3] The record is unclear regarding when Rondini arrived. According to plaintiffs, he "entered . . . without a warrant or consent, after [Duncan] had asked the [other officers] to leave." Doc. #64-6 (Duncan Aff.) at 6. Rondini's affidavit states that he arrived when Duncan and the children were all in the living room, before Stook and Hoffkins left to obtain a search warrant. *See* Doc. #62-4 (Rondini Aff.) at 1–2.

Eventually, because Duncan repeatedly instructed his children to go upstairs, the police arrested him for police interference in violation of Connecticut General Statutes section 53a-167a(a). He was handcuffed and taken to the Greenwich police station. While he was on the steps of his home being taken away, the police again "threatened me that they would contact DCF to have my children taken from me." Doc. #64-6 (Duncan Aff.) at 8.

The children were left alone for hours in the family living room with three of the officers (Hilderbrand, Quezada, and Rondini). At some point around 1:30 a.m., Stook and Hoffkins returned with a search warrant for the entire residence. The police then executed the search warrant, resulting in the recovery of dozens of apparently illicit pills from Scott's bedroom. Doc. #62-2 (Hilderbrand Aff.) at 4; Doc. #62-3 (Quezada Aff.) at 4; Doc. #62-4 (Rondini Aff.) at 3; Doc. #62-5 (Stook Aff.) at 3; Doc. #62-6 (Hoffkins Aff.) at 3; Doc. #64-10 at 2.

At about 4:00 a.m., Duncan returned home after having been booked on the arrest charge and after the police had finished their search of his residence. Some months later, prosecutors entered a *nolle prosequi* and dismissed the criminal charge of police interference against Duncan.

In February 2013, Duncan and his 11-year-old daughter (plaintiff "Jane Doe") brought a civil rights suit in this Court, primarily under 42 U.S.C. § 1983. Count One of the complaint alleges that the five police officer defendants violated plaintiffs' right to be free from an unconstitutional search and seizure when they remained in the home and confined the family to the living room. Count Two alleges that defendants subjected Duncan to false arrest and malicious prosecution when he was placed under arrest and charged with unlawful interference under Connecticut General Statutes section 53a-167a(a). Count Three alleges that defendants violated the First Amendment rights of Duncan when they prevented him from video/audio-recording the police while they were in his home. Count Four alleges a *Monell* claim of

6

municipal liability against the Town of Greenwich stemming from the conduct of the five defendant police officers. Lastly, Count Five alleges a claim of intentional infliction of emotional distress against the five defendant police officers. Defendants now move for summary judgment on all claims. Docs. #60 & #62.

<strong>DISCUSSION</strong>

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *Count One – Fourth Amendment Unlawful Search and Seizure*

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment limits both searches and seizures. A "search" in the context of the

Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon a suspect's person, house, papers, or effects for the purpose of acquiring information. *See United States v. Jones*, 132 S. Ct. 945, 951 n.5 (2012); *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014). A "seizure" under the Fourth Amendment occurs when the police intentionally terminate one's freedom of movement by means of physical force or by show of their official law enforcement authority. *See Brendlin v. California*, 551 U.S. 249, 254 (2007); *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007).[4]

Here, the alleged "search" and "seizure" at issue are the officers' continued presence (trespass) in the home after Duncan told them to leave and the restrictions that they then placed upon Duncan and his children to move around their home. Plaintiffs do not otherwise contend that the police looked for evidence inside the home before securing a warrant or that their subsequent search for evidence exceeded the scope of the search warrant they eventually obtained.

It is well established that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972). Indeed, "[t]he core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014) (citing, *inter alia*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)). If police officers have neither a warrant nor valid consent, they need no

---

[4] Counts One and Two also plead "false arrest" under the "Constitution and laws of the United States." Compl. ¶ 34 (Count One), ¶ 35(Count Two). I assume that the federal claim of false arrest is the same as a claim under the Fourth Amendment for unlawful seizure. *See Seifert v. Rivera*, 933 F. Supp. 2d 307, 320 (D. Conn. 2013) ("A Section 1983 claim for false arrest or false imprisonment rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures." (alteration in original) (citing, *inter alia*, *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996))). Although the preamble to the complaint contains a passing reference to state law, there is no claim under state law made in the count-specific charging paragraphs of the complaint.

less than both probable cause and exigent circumstances in order to lawfully enter or remain in a person's home. *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014); *O'Hare*, 770 F.3d at 231 (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (*per curiam*)).

Of course, not every police violation of the Fourth Amendment may justify an award of money damages. That is because the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*per curiam*). The Supreme Court has recently explained that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083–84 (2011)). In this manner, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *al-Kidd*, 131 S. Ct. at 2085).

In light of the facts that I must accept as true for purposes of summary judgment, it is readily apparent that the police officers are not entitled to qualified immunity for the conduct set forth in Count One of the complaint. The first four officers to arrive at the residence—Hoffkins, Hilderbrand, Stook, and Quezada—obtained Duncan's lawful consent to enter his home when, after speaking to Duncan at his front door, Duncan invited them inside. That consent was voluntary and valid, even though it was given on the basis of the officers misleading him into believing that they merely wanted to talk with him privately about Scott's drug problems. *See Florida v. Jardines*, 133 S. Ct. 1409, 1422 (2013) ("'[C]onsent to an entry is often given legal

effect even though the entrant has intentions that if known to the owner of the property would cause him for perfectly understandable and generally ethical or at least lawful reasons to revoke his consent[.]'" (quoting *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995))); *Bauer v. City of Hartford*, 2010 WL 4429697, at *8 (D. Conn. 2010) ("[T]he law permits police to pressure and cajole, conceal material facts, and actively mislead in seeking consent to enter or to search." (internal quotation marks and citation omitted)).

But Duncan, as homeowner, had a "'constitutional right to revoke or limit the scope of [the] search to which he ha[d] consented.'" *United States v. Fadul*, 16 F. Supp. 3d 270, 283 (S.D.N.Y. 2014) (quoting *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004)). And the parties all agree that Duncan revoked his consent and told the police officers to leave his home. According to Duncan, he told the police he would be agreeable to a search of the premises if the police returned with a search warrant.

Yet the police remained. What's more, another officer—Rondini—entered the house without any consent whatsoever to do so. The fact that a homeowner may consent to the entry of a single police officer into his home is surely not a blanket license for the rest of the police force to come in as they please.[5] Moreover, by the time Rondini entered the house, Duncan had

---

[5] *But see United States v. Rubio*, 727 F.2d 786, 797 (9th Cir. 1983) ("We are unpersuaded that a consent search may be validly qualified by the number of officers allowed to search, and we so hold. Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost."); *see also Wildauer v. Frederick County*, 993 F.2d 369, 372 (4th Cir. 1993) (relying on *Rubio* to conclude that "[h]aving consented to [one officer's] entry, Wildauer could not deny access to the other members of the party"); *Hoffman v. County of Delaware*, 41 F. Supp. 2d 195, 214 (N.D.N.Y. 1999) (relying on *Rubio* to conclude that "a consent may not be qualified by the number of officers allowed to search"). These contrary decisions are plainly inconsistent with controlling authority of the United States Supreme Court. First, the Supreme Court has made clear not only that the scope of a suspect's consent is limited to what is objectively reasonable but also that the power to consent to a search includes the power to limit its scope. *See Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991). Second, the Supreme Court has more recently made clear that a "search" occurs not only when there has been an intrusion upon an expectation of privacy but also when the police trespass on a person's home. *See Jardines*, 133 S. Ct. at 1414. Even if I were to conclude for qualified immunity purposes that the police could reasonably rely on the mistaken conclusions in *Rubio* and *Wildauer* with respect to the authority of Rondini to enter the home without consent, this would not alter my conclusion with respect to the multiple other grounds indicating that the police violated clearly established law of which an objectively reasonable police officer would have been aware.

already made it clear to the other officers that his consent for their presence had been revoked. *See* Doc. #64-6 (Duncan Aff.) at 6. Rondini knew that. His police report states that "Duncan Lawson would continuously order all the Investigators out of his home. Duncan related to the Investigators that we were in violation of his rights and requested numerous times that we leave the residence immediately." Doc. #64-12.

Absent continuing consent, the police could remain in the Lawson home only if they had both probable cause and exigent circumstances to justify staying there. *Kirk*, 536 U.S. at 638. Plaintiffs do not dispute that the officers had probable cause to believe illegal OxyContin pills would be found in Scott's bedroom. But exigent circumstances were plainly lacking, not only to allow the police to continue their occupation of the house but also to confine the family to the living room for hours before a warrant could be secured.

Neither police prerogative nor police convenience amounts to exigent circumstances. Rather, as the Second Circuit has explained, the "essential question" to determine if exigent circumstances may justify a warrantless search is "whether law enforcement agents were confronted by *an urgent need* to render aid or take action." *O'Hare*, 770 F.3d at 233 (emphasis added) (internal quotation marks and citation omitted). Relevant factors include:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; . . . (6) the peaceful circumstances of the entry[;] . . . [and (7) whether] quick action is necessary to prevent the destruction of evidence.

*United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) (internal quotation marks and citation omitted), *cert. denied*, 133 S. Ct. 2797 (2013); *see also King*, 131 S. Ct. at 1856 ("[T]he need to

prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search." (internal quotation marks and citation omitted)).

These factors weigh overwhelmingly against the police. The police's search for the "few pills" that Scott readily admitted were in his bedroom was hardly a law enforcement inquest of the highest order. *See, e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984) (invalidating warrantless entry into home to question a person suspected of committing a misdemeanor crime). For that matter, Scott was already securely in police custody, and defendants have not cited any reason to have suspected at the time that Scott's father, 16-year-old brother, or 11-year-old sister were partners in his illicit activity or that they posed any threat at all to the police.

It is especially difficult to understand how Rondini could have conceived of his nonconsensual entry as urgently necessary, given that there were already four officers at the residence. Even if two of the officers were preparing to leave in order to seek a warrant, there would still be two armed police officers remaining—surely, more than a physical match for Duncan Lawson and his two sleepy children in the family living room.

Nor was there a need for the police to do what they did to prevent the family from destroying evidence. No evidence shows that Duncan even knew Scott had been arrested until the police arrived to tell him so as part of their stratagem to gain entry into the home under false pretenses. Certainly, the sleeping children did not know of Scott's arrest until the police insisted that they be woken up and essentially held hostage in the family's living room as inducement for Duncan to relent in the exercise of his constitutional rights.

The facts of this case are easily distinguished from *Kentucky v. King*, 131 S. Ct. at 1849, in which the Supreme Court upheld the warrantless entry by police to an apartment after they were in hot pursuit of a suspect, knocked on the door of an apartment where they thought he

might be, and then heard what they thought was the active destruction of evidence inside. Here, there was no hot pursuit. And there was no evidence at all that the Lawson family members had plans to enter Scott's room to destroy evidence.[6]

Defendants also argue that "there is a likelihood that weapons are located in areas where there are illegal drugs." Doc. #62-1 at 9. But this alleged concern about possible weapons appears nowhere on the officers' application for a search warrant, and the warrant they obtained did not authorize them to search for or seize any weapons. Nor was it mentioned in the several police reports pertaining to Scott's arrest and the search of the Lawson residence. If the police were genuinely concerned about weapons, one would expect that they would have asked the Lawson family if they had any such weapons. But the record here does not indicate that any such queries were made. So far as the record here reflects, Duncan Lawson told the police that he would cooperate if the police returned with a search warrant.

Accordingly, a genuine question of fact remains as to whether an objectively reasonable police officer could have believed that locking down the Lawson home pending an application for a search warrant was necessary for any valid police purpose. *See United States v. Simmons*, 661 F.3d 151, 158–59 (2d Cir. 2011) (where testimony did not indicate that officers had seen or heard anything that would lead them to believe there was another, potentially threatening occupant in a residence, "groundless, retrospective speculation does not translate to exigency");

---

[6] In *Kentucky v. King*, the Supreme Court held that the exigent circumstances exception may apply even in circumstances where it is the conduct of the police that has "created" the exigency (*e.g.*, suspects engaged in destruction of evidence following a police chase), provided that "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." *King*, 131 S. Ct. at 1858. Here, although it is clear that the police knock-and-talk tactic was a cause of any claimed exigency, my conclusion is that a genuine issue of fact remains to suggest that no objectively reasonable officer would have believed there to be exigent circumstances that warranted remaining in and detaining the family in the home. In light of this conclusion, there is no need for me to address any argument that it was the conduct of the police that impermissibly created an exigency in this case.

*Moore v. Andreno*, 505 F.3d 203, 213–14 (2d Cir. 2007) (officers' speculation that suspect might be in a house did not amount to exigency, when "[t]here is no suggestion that anyone thought" the suspect was actually there); *see also O'Hare*, 770 F.3d at 235 (generalized facts about the city and the nature of gun trafficking, without specific facts or evidence particular to the case, are not pertinent to the analysis and cannot support a finding of exigency).

It is hard to see how an objectively reasonable police officer could have thought there to be some legitimate law enforcement purpose to be served by waking up a sleeping 11-year-old girl to subject her to the harrowing police-state experience that the Lawson family endured in their living room that night. If the police wish to gain the respect of the citizenry, surely they should pause before resorting to late-night home entries under false pretenses and to treating innocent family members and children as if they were dangerous criminals.

Not only did the police officers' continued presence in the home constitute an unlawful *search* after Duncan had revoked his consent for them to remain there, but so too did the police officers' detention of the family in the living room constitute an unlawful *seizure*. Quite remarkably, the officers argue that there was no seizure, because "the Plaintiffs were told they could leave the Residence if they did not want to stay in the living room." Doc. #62-1 at 9. But I cannot accept the premise of this because it is controverted by the affidavit of Duncan Lawson. In any event, defendants' argument misunderstands the definition of a seizure under the Fourth Amendment—that a person is "seized" if an objectively reasonable person is either physically restrained or would not feel free to terminate an encounter with the police. *See, e.g.*, *Brendlin*, 551 U.S. at 254–55; *United States v. Drayton*, 536 U.S. 194, 201 (2002). The test does not presuppose that a resident must leave *his own home* to terminate an encounter with police who have unlawfully refused the resident's demand that that the police leave.

It is little wonder that there are "no Supreme Court or Second Circuit decisions squarely on point," Doc. #62-1 at 9–10, because no tenable argument could be advanced in the first place. After all, this is America; the police here are not at liberty—without some constitutional review under the Fourth Amendment—to occupy a home and then offer families a "choice" between huddling together in a single room and altogether abandoning the home to the police in the dead of the night.

The facts of this case are easily distinguished from *Illinois v. McArthur*, 531 U.S. 326 (2001), in which the Supreme Court held that it was reasonable for law enforcement officers to refuse to let an individual suspected of marijuana possession enter his trailer home for two hours unless accompanied by a police officer, while they awaited issuance of a search warrant. *Id.* at 331–33. In *McArthur*, the suspect himself was present to inspire concerns about the potential destruction of evidence. Notably, the Supreme Court found in *McArthur* that "[t]emporarily keeping a person from entering his home . . . is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search." *Id.* at 336. Moreover, in *McArthur*, it was undisputed that a "seizure" occurred to trigger Fourth Amendment review when the police restricted the suspect from entering his home, and the only issue was whether this seizure was justified by exigent circumstances. *Id.* at 331. It follows, *a fortiori*, that when the police occupy the home and confine a family to their living room (or offer them the "choice" to abandon the home), then a "seizure" has occurred and can only be justified by a warrant or some other reasonableness exception to the Fourth Amendment's warrant requirement.

Defendants likewise rely on *Segura v. United States*, 468 U.S. 796 (1984), in which the Supreme Court held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an

15

unreasonable seizure of either the dwelling or its contents." *Id.* at 810. But *Segura* is obviously

distinguishable, because there the residents of a dwelling were arrested prior to the seizure of the

dwelling, and the seizure at issue consisted solely of securing an unoccupied building, rather than

anyone inside. By contrast, in the instant case, plaintiffs themselves were seized. In analyzing

*Segura*, the Second Circuit has noted:

> *Segura* validates only the metaphysical "seizure" of the contents of the apartment
> . . . . However, the Supreme Court had no occasion to review the holding of the
> District Court, affirmed by the Second Circuit, that the seizure of a person within
> the apartment was unlawful. . . . Perhaps the rationale of *Segura* would permit
> minimal restraint upon bystander occupants of premises to prevent them from
> destroying evidence or otherwise interfering with a search, but it suggests no
> general authority to impose detention upon those for whom the Government lacks
> probable cause to arrest.

*Ayeni v. Mottola*, 35 F.3d 680, 690 n.13 (2d Cir. 1994), *abrogated on other grounds by Wilson v.*

*Layne*, 526 U.S. 603 (1999).

Nor does this case compare to *Seifert v. Rivera*, 933 F. Supp. 2d 307 (D. Conn. 2013), in

which Judge Bryant considered a five-and-a-half-hour, in-home detention of a house's occupants

prior to the issuance of a search warrant. The facts were far different in *Seifert,* because the

underlying crime was a string of 13 armed bank robberies and because there was reason to

believe that other members of the family were complicit in the robberies. *Id.* at 325–28.

I do not question that the police may constitutionally engage in "reasonable steps to

secure a scene to preserve evidence while they await[ ] a warrant." *Riley v. California*, 134 S. Ct.

2473, 2488 (2014). Here, however, the police actions were far from objectively reasonable when

viewed in the light most favorable to plaintiffs. The police deployed a cynical ruse to play upon a

father's heartstrings to allow them to enter the home for purposes of a therapeutic conversation

about his son's substance abuse problems. Once inside, they changed course to insist on a search

of Scott's room—either by means of prevailing on Duncan to consent or by means of detaining

16

his entire family until Duncan might change his mind or until a judge might issue a late-night warrant. And the police did all this in the absence of signs that Duncan or his sleeping children were in need of detention to prevent them from destroying evidence or that they posed any other threat of harm.

In short, genuine issues of fact remain to show that the police conducted an unlawful search of the Lawson home when they refused to leave after they were told to do so. Genuine issues of fact also remain to show that the police conducted an unlawful seizure of plaintiffs when they confined them to the living room while awaiting issuance of a search warrant. The Fourth Amendment prohibits unreasonable searches and seizures, and genuine issues of fact abound to suggest that the Greenwich police were anything but reasonable or lawful in their treatment of the Lawson family in their own home on that night in November 2010.

For similar reasons, I have little difficulty concluding that the police officer defendants have yet to demonstrate that they should be entitled to qualified immunity. Each of the rights that they allegedly violated was clearly established at the time and would have been known to an objectively reasonable police officer. In November 2010, it was clearly established that "absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks and citation omitted). It was also clearly established that the officers had no right to remain in the home once consent to their entry was revoked. *See Moran Vargas*, 376 F.3d at 114. And it was clearly established that exigent circumstances would exist only if "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action," *United States v. Klump*,

536 F.3d 113, 117–18 (2d Cir. 2008) (internal quotations marks and citation omitted), such as in order to prevent the destruction of evidence. *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995).

I do not rule out the possibility that a qualified immunity defense might succeed after trial. "Although qualified immunity is a question of law, if there is a dispute of fact as to the officer's conduct, 'the factual questions must be resolved by the factfinder' before qualified immunity can be determined." *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 445 (D. Conn. 2013) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). But because a reasonable jury could conclude that the facts would not have led an objectively reasonable officer to believe the actions were needed to prevent the destruction of evidence or respond to any other exigency, the defendant officers are not at this time entitled to qualified immunity with respect to the unlawful search and seizure alleged in Count One.

### Count Two – False Arrest and Malicious Prosecution of Duncan Lawson

Count Two alleges both false arrest and malicious prosecution arising from the police's arrest of Duncan Lawson following his resistance to their occupation of his home. He was charged under Connecticut General Statutes section 53a-167a(a), which forbids "interfering with an officer when such person obstructs, resists, hinders or endangers . . . [the officer] in the performance of . . . [his or her] duties." Duncan was arrested for continuing to tell his children to return to their bedrooms in disobedience of the officers' orders that they remain in the living room. The charge was eventually dropped.

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*,

18

316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citations omitted). To prevail on

a claim of false arrest, a plaintiff must show that "(1) the defendant intentionally arrested him or

had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest;

and (4) the arrest was not supported by probable cause." *Sharnick*, 935 F. Supp. 2d at 443

(internal quotation marks and citation omitted). Similarly, to prevail on a claim of malicious

prosecution, a plaintiff must prove that that he was subject to a Fourth Amendment seizure

(which is not disputed here once Duncan was actually arrested) and that "(1) the defendant

initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding

terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the

defendant acted with malice." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (*per

curiam*) (internal quotation marks and citation omitted); *see also Simms v. Seaman*, 308 Conn.

523, 542, 69 A.3d 880 (2013) (malice involves acting "primarily for a purpose other than that of

bringing an offender to justice" (internal quotation marks and citation omitted)).

It is clear that genuine issues of fact exist for most of the elements of the false arrest and

malicious prosecution claims. There is no dispute that the police seized and arrested Duncan

Lawson with his knowledge but without his consent. There is at least a genuine issue of fact that

the prosecution proceedings terminated in his favor. *See Roberts*, 582 F.3d at 420–21 (discussing

significance of a *nolle prosequi* under Connecticut law and noting that whether a *nolle prosequi*

disposition satisfies the "favorable termination" element depends on "facts material to the

reasons for the nolle prosequi"). A genuine issue also remains as to the element of malice in light

of evidence that the officers threatened to report Duncan to DCF. Malice may also be

circumstantially inferred from the officers' apparent disapproval of Duncan's choice not to

consent to a search of his home and his wish to seek to exercise his right to video/audio record

19

activities within his own home.

For both the false arrest and malicious prosecution claims, the closest issue is whether probable cause supported the arrest of Duncan and, more specifically, in light of the qualified immunity defense, whether even *arguable* probable cause existed to arrest him for police interference. *See, e.g.*, *Stansbury v. Wertman*, 721 F.3d 84, 89 & n.3, 94–95 (2d Cir. 2013). Where, as here, the conduct at issue is merely verbal interference—rather than physical interference—it has long been the rule that merely questioning or protesting the police does not violate Connecticut General Statutes section 53a-167a and that the verbal interference must amount to no less than "fighting words" that by their very utterance would inflict injury or tend to incite an immediate breach of the peace. *See Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988) (citing *State v. Williams*, 205 Conn. 456, 473, 534 A.2d 230 (1987)); *Berg v. Sorbo*, 2014 WL 1117643, at *3–4 (D. Conn. 2014).

In *State v. Aloi*, 280 Conn. 824, 911 A.2d 1086 (2007), and *State v. Silva*, 285 Conn. 447, 939 A.2d 581 (2008), the Connecticut Supreme Court upheld convictions for police interference when individuals refused to provide identification to police officers during lawful vehicle stops, on the ground that the *conduct* of refusing to provide identification—rather than the speech involved in the refusal—could hamper or delay the progress of the police in carrying out their duties. *Silva*, 285 Conn. at 456–58; *Aloi*, 280 Conn. at 833–34 & 833 n.14. The *Aloi* Court noted the possibility that "a refusal to comply with certain other types of lawful police commands or orders may provide a basis for a prosecution under § 53a-167a," but limited its holding to the specific facts of that case—a lawful *Terry* stop. *Aloi*, 280 Conn. at 841 n.22.

"Connecticut courts most frequently find illegal interference with a police officer where the officer makes a direct request, which the [individual] refuses to comply with, and it is that

*refusal* that hinders or impedes the course of the investigation of the [individual] or the performance of the officer's duties." *Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 168 (D. Conn. 2008). In *Acevedo*, Judge Underhill denied a police officer's motion for summary judgment premised on a qualified immunity defense because a question of material fact remained concerning whether the plaintiff's loud yelling into a chaotic crowd was directed to incite the crowd to take action against the police officer and thus impede the officer's ability to carry out an arrest of another person. *Id.* at 168–69.[7]

Here, it may well be that the type of verbal interference—Duncan Lawson's instructions to his children to ignore the police and go upstairs—at least arguably qualifies as conduct that could be prosecuted under the police interference statute. But I need not decide this issue, because a genuine issue remains as to whether the police officers' commands were lawful in the first place. As noted by the Connecticut Supreme Court, "a refusal to comply with certain . . . types of *lawful* police commands or orders may provide a basis for prosecution under § 53a-167a." *Aloi*, 280 Conn. at 841 n.22 (emphasis added); *see also Ruttkamp*, 2012 WL 3596064, at *7–8 (no qualified immunity when the verbal instruction did not cause anyone to "*unlawfully* refuse an officer's request") (emphasis in original). For the reasons discussed as to Count One above, a genuine issue of fact remains whether any objectively reasonable officer could have believed that he had a lawful basis to be in the Lawson home, and absent a lawful basis even to

---

[7] In *Ruttkamp v. De Los Reyes*, 2012 WL 3596064 (D. Conn. 2012), a woman told her daughter not to play voicemails on her cell phone to police officers who did not have a search warrant, while a police officer repeated "Don't listen to her, play them, play them." *Id.* at *3. The daughter did not play the messages, and the mother was arrested under section 53a-167a for interfering. Judge Underhill concluded that the police officers were not entitled to qualified immunity at the summary judgment stage, because the mother's verbal conduct "did not involve the kind of disobedience and noncompliance that *Aloi* and its progeny meant to bring within [the statute's] reach," in part because she "never refused to comply with an officer's requests" or "disobey[ed] an officer's orders." *Id.* at *7. Moreover, because the daughter was never lawfully "seized" and thus was always legally free to refuse to consent to the warrantless search of her voicemail messages, the mother's verbal conduct could not have "somehow aid[ed], abet[ted], or exhort[ed] [her daughter] to *unlawfully* refuse an officer's request." *Ibid* (emphasis in original).

be in the home, it cannot be said that there was a lawful basis to order anyone in the home to obey police commands, much less to arrest Duncan Lawson for instructing his children not to do so.

In short, genuine issues of fact remain as to Duncan Lawson's claim of false arrest and malicious prosecution as alleged in Count Two (and as to the defendant officers' corresponding qualified immunity defense). Accordingly, defendants' motion to dismiss Count Two is denied.

### Count Three – First Amendment Right to Record the Police

Duncan Lawson claims that the officers' refusal to allow him to retrieve a device to video-audio record the police while they were in his home was a violation of his rights under the First Amendment. The officers are protected by qualified immunity against this First Amendment claim unless the right to record them was clearly established at the time of the incident, *i.e.*, that "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023.

As of November 2010, the law of the Second Circuit was not clearly established to recognize a right under the First Amendment to record police conduct. *See Ortiz v. City of New York*, 2013 WL 5339156, at *3–4 (S.D.N.Y. 2013) (police officers entitled to qualified immunity on such claim "because neither the Supreme Court nor the Second Circuit has addressed the right" to record police conduct); *Mesa v. City of New York*, 2013 WL 31002, at *25 (S.D.N.Y. 2013) ("[T]he right to photograph and record police is not clearly established as a matter of constitutional law in this Circuit. . . . [N]o Second Circuit case has directly addressed the constitutionality of the recording of officers engaged in official conduct."). Defendants are

therefore entitled to qualified immunity, and summary judgment will be granted as to plaintiffs' First Amendment claim as alleged in Count Three of the complaint.

### Count Four – Town of Greenwich Liability

Count Four of the complaint alleges a *Monell* claim of municipal liability against the Town of Greenwich arising from the defendant officers' conduct. It is well established that a municipality may not be liable under § 1983 in *respondeat superior* for the misconduct of its employees generally, but may be liable only if the individual officers' misconduct was the product of municipal policy, practice, or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014).

As troubling as the conduct of the police officers might be, plaintiffs here have done nothing to show that the officers' alleged misconduct was a result of any municipal policy or custom. The Town has established that none of the defendant officers were in policymaking roles. At oral argument, plaintiffs' counsel alleged that the Town had failed to train the officers, but plaintiff did not conduct any discovery with respect to the Town's police training policies or the training backgrounds of any of the individual defendants. The Court will grant the Town's summary judgment motion as to Count Four of the complaint.

### Count Five – Intentional Infliction of Emotional Distress

Count Five of the complaint alleges that the actions of the officers amounted to the intentional infliction of emotional distress.

> In order to prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Gillians v. Vivanco-Small*, 128 Conn. App. 207, 211, 15 A.3d 1200 (2011) (internal quotation marks and citation omitted). The standard for extreme and outrageous conduct is stringent: "liability 'requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'" *Devone v. Finley*, 2014 WL 1153773, at *16 (D. Conn. 2014) (quoting, *inter alia*, *DeLaurentis v. City of New Haven*, 220 Conn. 225, 267, 597 A.2d 807 (1991)). Such conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Ibid* (quoting *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210–11, 757 A.2d 1059 (2000)).

Viewing the facts in the light most favorable to plaintiffs, I conclude that a genuine issue of fact plainly remains concerning plaintiffs' claim for intentional infliction of emotional distress. The police gained entry to the Lawson home late at night under false pretenses. They refused to leave when asked to do so. They unreasonably required Duncan to wake up his children, and they confined Duncan and the children to the living room. They forced the children to choose between obeying their father's instructions to go back upstairs to sleep and the officers' unlawful instructions not to. They arrested Duncan despite their absence of lawful authority to be in the home. They took Duncan away under arrest, leaving his children alone with stranger policemen late at night in the home. They threatened to report Duncan to DCF and to have his children taken away. They did all this because Duncan stood up for his constitutional right to have the police obtain a warrant to search his home. A reasonable jury could conclude that the police engaged in outrageous conduct intended to inflict emotional distress on the Lawson family.

CONCLUSION

For the reasons set forth above, the defendant police officers' motion for summary judgment is DENIED as to Count One, Count Two, and Count Five, and it is GRANTED as to Count Three. The Town of Greenwich's motion for summary judgment is GRANTED as to Count Four. The Clerk of Court shall dismiss the Town of Greenwich as a defendant in this case.

The parties shall file their joint trial memoranda within 30 days and shall consult with chambers concerning scheduling for trial. It is so ordered.

Dated at Bridgeport this 23rd day of February 2015.

/s/ Jeffrey Alker Meyer
Jeffrey Alker Meyer
United States District Judge