## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUNCAN LAWSON and JANE DOE,<br>*A Minor Child, PPA Duncan Lawson*,<br>*Plaintiffs*,<br><br>v.<br><br>TIMOTHY HILDERBRAND, *et al.*,<br>*Defendants*. | No. 3:13-cv-00206 (JAM) |

## ORDER GRANTING DEFENDANTS' MOTION
## FOR JUDGMENT AND DISMISSING COMPLAINT

This is a Fourth Amendment case about the police occupation of a home without a warrant and in the face of an innocent homeowner's insistence that the police leave. As I explained at length in my prior summary judgment ruling, the police in Greenwich, Connecticut tricked their way into Duncan Lawson's home at 10:30 pm one night on a pretense that they wanted to talk with him about his 21-year-old son's drug problem.[1] What the police really wanted was to search the Lawson home for the son's drugs. The police had already arrested the son elsewhere in town that night, and he had told them he kept a few oxycodone pills in his bedroom at home. Once Duncan Lawson made the mistake of trusting the police to enter his home, the police took full strategic advantage. They then insisted for the first time that they wanted to search the son's bedroom.

---

[1] *See Lawson v. Hilderbrand*, 88 F. Supp. 3d 84 (D. Conn. 2015), *rev'd and remanded*, 2016 WL 944770 (2d Cir. 2016). Because this matter came before me on a motion for summary judgment by the defendant police officers, I was required to construe the facts in the light most favorable to the plaintiffs, just as the Second Circuit has insisted that I do. *See, e.g., Rogoz v. City of Hartford*, 796 F.3d 236, 249-50 (2d Cir. 2015) (reversing grant of summary judgment for police defendants because of district court's failure to accept the facts in the light most favorable to plaintiff). I describe them in the same manner in this ruling, but note that the officers involved disagree in major respects with plaintiffs' version of the facts. Nothing in this ruling should be understood to decide or express an opinion about what facts would have been established at trial.

But Duncan Lawson refused to consent. He told the police they should seek a warrant. He stood by his rights in the face of threats from the police that they would seek a search warrant for the *entire* house, not just the son's bedroom. And he stood by his rights even after the police threatened to report him to the Department of Children and Families (DCF) and to have Duncan Lawson's two other children—ages 11 and 16—taken away from him.[2]

The police then decided to get a search warrant, and two officers were dispatched to draft the warrant papers and find a judge to sign them. In the meantime, however, the remaining police officers refused to leave the house until a warrant could be obtained and despite Duncan Lawson's demand that they leave. To up the proverbial ante, the police also decided that they needed to "secure" the home. They forced Duncan Lawson to wake his two sleeping children, and the police herded the family into a common room downstairs to await the hours long into the night that it might for officers to return with a search warrant.

Duncan Lawson became outraged. He told his children to go back upstairs. He told one of his children to retrieve a phone camera so that he could record what he believed to be abusive conduct by the police. The police stopped him, and then they arrested Duncan Lawson for interfering with the police. They hauled him away in the dead of the night, leaving the two children alone with the police in the home. For good measure, the police told Duncan Lawson again on his way out that they would contact DCF to have his children taken away from him.

In my prior ruling, I concluded that these alleged facts established a flagrant violation of the Fourth Amendment. Assuming the alleged facts were true, this seemed to me a reprehensible example of coercive, police-state-style tactics well out of proportion to any legitimate police interests (here, the pursuit of a few pills of oxycodone). I thought there was good reason why

---

[2] As the police already knew from their interview of the son, Duncan Lawson's spouse had died the year before. A threat to take the children away would have been a threat to render them orphans.

Duncan Lawson was outraged. In my view, any reasonable person would be surprised and outraged to learn that if they consent to a police request to enter their home for the purpose of answering questions, then the Fourth Amendment does not require the police to leave if they are told to leave but allows the police to take a whole family as prisoners for so long as the police may take to seek, obtain, and execute a search warrant.

But of course it was not enough for me to conclude that there was a violation of the Fourth Amendment, because the police could not be held liable for civil money damages merely for violating the Fourth Amendment. Under well-established principles of qualified immunity, the police could be liable only if an objectively reasonable officer would have known that the conduct of the police was in violation of clearly established law. For my part, despite the absence of a prior published appellate opinion involving a similarly egregious fact pattern, I thought the facts of this case to be so extreme that an objectively reasonable officer would—and ought—to have known that what the police did that night was a violation of the rights of Duncan Lawson and his family to be free from unreasonable search and seizure.

The Second Circuit reversed. The Court of Appeals did not decide whether the police violated the Fourth Amendment. Instead, the Court decided more narrowly that the police officers should be protected from liability by qualified immunity for "the lack of clearly established law barring the police actions" and because "[t]he police entered the home with Duncan Lawson's consent, and when that consent was revoked it was objectively reasonable for the defendants to believe that exigent circumstances made their continued presence in the house, and their confinement of the residents to the living room, lawful." *See Lawson v. Hilderbrand*, 2016 WL 944770, at *1 (2d Cir. 2016).[3]

---

[3] The Second Circuit's ruling does not further describe what exigent circumstances existed. In my ruling, I discussed at length why I did not believe that exigent circumstances existed. *See Lawson*, 88 F. Supp. 3d at 93-95.

It was perfectly permissible for the Second Circuit to decide this case on qualified immunity grounds without ruling on the constitutional merits of Duncan Lawson's claims. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223 (2009). Nevertheless, there is no rule that prevents a federal court from addressing the constitutional merits in a qualified immunity case, and I am hopeful that the Second Circuit will one day decide to consider the constitutionality of the type of "knock and talk" practice as it was allegedly deployed by the police in this case.

Absent such an examination of the underlying constitutional issue, I fear that police officers in the Second Circuit are and remain free to engage in the kind of tactics that the police allegedly did here: that is, to trick their way into the home, only then to seek consent to search the home, and then to lock down the entire home and all its occupants for several hours pending the securing of a search warrant if the homeowner elects to exercise his constitutional rights. It won't matter—as in this case—if the police use such tactics when they are in search of just a few pills that a suspect has freely admitted to possessing in his family's home. It won't matter that the homeowner has been cooperative (other than to assert his constitutional rights). It won't matter that the homeowner has not said or done anything to indicate that he will destroy evidence. And it won't matter if there are sleeping children whose memories may be forever scarred by the experience of a late-night police occupation of their home.

Absent a determination by the Second Circuit (or Supreme Court) of the underlying constitutional issue, there won't be "clearly established" law to deter future police officers from the type of overreaching conduct that has been alleged to have occurred in this case. *See, e.g.*, *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006). As the Second Circuit has made clear, district court judges have no authority to articulate a legal standard that will be of consequence for future claims of qualified immunity. *Ibid.* And perhaps for good reason. *See* Richard Posner,

REFLECTIONS ON JUDGING 288 (Harv. Univ. Press 2013) (noting that "[t]he heavier workload of district court judges than of courts of appeals judges is another reason … for not giving precedential effect to district court opinions" and that "district court opinions are far more likely than court of appeals opinions to be reviewed and reversed by a higher court and so are less dependable evidence of what the law is" and that "district judges sit by themselves and so do not benefit from colleagues' insights").

Others have argued that when an appellate court faces a claim of qualified immunity, it should reach and resolve the underlying constitutional issue, because—as one appellate judge has recently acknowledged—"if a court reviewing a constitutional claim to which qualified immunity applies need not address the merits of the claim, the same right may be violated time and again, with courts declining each time to provide a remedy or state the law for future cases." Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219, 1249 (2015).

After all, litigants and the public alike count on our appellate courts not merely to process appeals but to articulate the law, and when an appellate court applies qualified immunity in a manner that declines to reach the constitutional merits of a claim, then this possibly "interferes with the law-pronouncing function of the federal courts and reduces the amount of guidance about the meaning of the Constitution for both government officials and the public at large." Alan K. Chen, *Qualified Immunity Limiting Access to Justice and Impeding Development of the Law*, Hum. Rts., July 2015, at 8, 9 (2015); *see also* Karen Blum, Erwin Chemerinsky & Martin A. Schwartz*, Qualified Immunity Developments: Not Much Hope Left for Plaintiffs*, 29 Touro L. Rev. 633, 647-50 (2013) (discussing inclination of appellate courts to avoid merits inquiry);

Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. Cal. L. Rev. 1, 49-65 (2015) (recommending that appellate courts explain why they decline to address the merits of constitutional claims and noting that fewer than 10% of federal appeals courts explain why they have decided not to address the underlying constitutional claim).

This is by no means to say that appellate courts should invariably resolve the underlying constitutional claim on its merits when deciding questions of qualified immunity. There may be powerful judicial economy reasons not to do so, and I do not doubt that the qualified immunity rule is appropriately applied without resolution of the merits in many instances where the police are engaged in conduct highly similar to that which has been previously approved by prior case law, or where the police are reacting to emergency circumstances that suddenly confront them, or where it seems at worst that the police acted negligently (perhaps grossly so). I myself have seen and resolved such cases this way.[4]

Still, this case seems different. Reliance on the qualified immunity rule—without a resolution of the merits—is more troubling when facts suggest that police have *deliberately* deployed a stratagem to circumvent people's assertions of their rights and the sanctity of their homes. A failure to address the merits in such circumstances may unwittingly reward the police for the use of clever techniques that are designed to cheapen the exercise of constitutional rights.

And there is surely a paramount interest besides in having clear rules for what the police may do inside a person's home. It seems to me that for such cases as this the courts of appeals should clarify the constitutional baseline for future cases, even if courts might otherwise

---

[4] *See, e.g.*, *Estate of Devine v. Fusaro*, 2016 WL 183472 (D. Conn. 2016); *Ozga v. Elliot*, 2015 WL 9286767 (D. Conn. 2015); *Dixon v. Santiago*, 2015 WL 9582729 (D. Conn. 2015).

conclude that—for lack to date of a clearly established rule—qualified immunity should insulate the unconstitutional conduct in the one case before them.

* * *

In light of the Second Circuit's ruling, defendants have moved for judgment in their favor on plaintiffs' remaining claims in this case. The Second Circuit limited its ruling to the first count of the complaint in this case (involving the officers' entry and occupation of the home), and the Second Circuit did not address the remaining counts of the complaint that challenge the lawfulness of the arrest of Duncan Lawson and that claim intentional infliction of emotional distress.

On April 1, 2016, I convened a teleconference of the parties and set forth my reasons why I thought there was likely merit to defendants' motion. As I stated during the course of the teleconference, the Second Circuit's ruling undercut my prior determination that the police officers could be liable for their continued presence in the home. Accordingly, the ruling likewise invalidates my determination that the officers could be liable for the arrest of Duncan Lawson when he refused to obey their commands. Moreover, if—as the Second Circuit has concluded—an objectively reasonable law enforcement officer would not have known the conduct to be unconstitutional, then there would be little basis for a state law claim of intentional infliction of emotional distress.

I entered an order to require plaintiffs to file a response to defendants' motion by April 19, 2016. That date has come and long gone without any response. Accordingly, in light of plaintiffs' failure to respond and the apparent merit of defendants' motion in light of the Second Circuit's ruling, I will dismiss the remainder of the complaint in this case and in hopes that the underlying constitutional issues will one day be addressed and resolved by a higher court.

## CONCLUSION

For the reasons set forth above, the remaining counts of the complaint are DISMISSED,

and the Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 30th day of May 2016.

/s/ Jeffrey Alker Meyer
Jeffrey Alker Meyer
United States District Judge